**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RICHARD FLETCHER, Derivatively on Behalf of FUNKO, INC., | |
| Plaintiff, | Civil Action No.: _____ |
| v. | |
| BRIAN MARIOTTI, JENNIFER FALL JUNG, RUSSELL NICKEL, GINO DELLOMO, MICHAEL LUNSFORD, CHARLES DENSON, ADAM KRIGER, KEN BROTMAN, SARAH KIRSHBAUM LEVY, and DIANE IRVINE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| FUNKO, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Richard Fletcher ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Funko, Inc. ("Funko" or the "Company"), with the U.S. Securities and Exchange Commission (the "SEC"); (b) review of pleadings filed in a federal securities class action against Funko, Brian Mariotti, Russell Nickel, and Jennifer Fall Jung, who are defendants herein, captioned *Nahas v. Funko, Inc.*, No. 2:20-cv-03130 (C.D.C.A.) (the "Securities Class Action"); (c) review and analysis of press releases and media reports issued by and disseminated by Funko; and (d) review of other publicly available information concerning Funko.

1

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Funko against certain current and former officers and members of the Company's Board of Directors ("Board") for breaches of fiduciary duty, unjust enrichment, and insider selling from August 8, 2019 through the present (the "Relevant Period").

2.      Funko is a pop culture consumer products company that designs and sells action figures, plush products, apparel, accessories, and homewares related to movies, TV shows, videogames, musicians, and sports teams.

3.      Throughout the Relevant Period, the Individual Defendants (defined herein) made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to the market, *inter alia*, that: (i) the Company was experiencing lower than expected sales; (ii) consequently, the Company was reasonably likely to incur a write-down for slower moving inventory; and (iii) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading.

4.      Furthermore, during the Relevant Period, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, netting collective proceeds of over $104 million.

5.      On February 5, 2020, after the market closed, the Company issued a press release reporting its preliminary fourth quarter 2019 financial results.  Therein, the Company stated that "[n]et sales are expected to be approximately $214 million, a decrease of 8% compared to $233 million in the fourth quarter of 2018."  The Company also disclosed a $16.8 million write-down to "dispose of slower moving inventory to increase operational capacity."

6.     Then, on March 5, 2020, after the market closed, the Company issued a press release announcing its fourth quarter and full year 2019 financial results, confirming the results previously disclosed on February 5, 2020, including a 4% decrease in net sales year-over-year to $213.6 million.  The Individual Defendants claimed that the disappointing financial results were due to, among other things, "softness at retail during the holiday season which led to a decrease in orders."

7.     Finally, during the Relevant Period, certain of the Individual Defendants negligently issued a materially false and misleading proxy statement urging stockholders to reelect certain directors under false pretenses.

8.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Funko has sustained damages as described below.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

10.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and the defendants are citizens of different states and the amount in controversy exceeds the sum of value of $75,000, exclusive of interest and costs.

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Funko is incorporated in this District.  In addition, the defendants have conducted business in this District, and defendants' actions have had an effect in this District.

## PARTIES

15.     Plaintiff, a citizen of the State of Georgia, is a current Funko stockholder and has continuously been a Funko stockholder at all relevant times.

16.     Nominal defendant Funko is a Delaware corporation with principal executive offices located at 2802 Wetmore Avenue, Everett, Washington 98201.  Funko's common stock is divided into publicly traded Class A common stock, and nonpublic Class B common stock, both of which entitle holders to one vote per share.

17.     Defendant Brian Mariotti ("Mariotti") has served as the Company's Chief Executive Officer ("CEO") since April 2017.   He also has served as the CEO of Funko Acquisition Holdings, L.L.C. ("FAH"), the predecessor of Funko, since October 2015, and as the CEO of Funko Holdings LLC ("FHL") since May 2013.  FAH is a holding company with no assets, and owns 100% of FHL, also a holding company, which in turn owns 100% of Funko, LLC, the Company's operating entity.  According to the Form DEF 14A filed on April 15, 2020 (the "2020 Proxy"), as of April 3, 2020, Mariotti was the beneficial owner of 3,464,295 shares of the Company's Class A common stock, as well as 2,531,690 shares of the Company's Class B common stock, which afford him approximately 5.1% of total voting power over matters set for stockholder determination as of that date.  Mariotti received $4,025,457 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $1,000,000 in

salary, $357,938 in stock awards, $1,341,827 in option awards, $1,313,250 in non-equity incentive plan compensation, and $12,442 in all other compensation. During the period when the Individual Defendants materially misstated information to the investing public to keep the price of the Company's stock artificially inflated, and before the scheme was exposed, Mariotti made the following sales of the Company's Class A common stock:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 8/12/2019 | 50,000 | $23.55 | $1,177,500 |
| 9/19/2019 | 400,000 | $25.42 | $10,168,000 |
| 9/20/2019 | 50,000 | $22.65 | $1,132,500 |
| 10/21/2019 | 50,000 | $18.14 | $907,000 |
| | | **Total Proceeds:** | **$13,385,000** |

Upon information and belief, Mariotti is a citizen of the State of Washington.

18.    Defendant Jennifer Fall Jung ("Fall Jung") has served as Funko's Chief Financial Officer ("CFO") since August 2019. Fall Jung received $1,248,155 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $153,654 in salary, $212,486 in stock awards, $790,622 in option awards, $67,262 in non-equity incentive plan compensation, and $24,131 in all other compensation. Upon information and belief, Fall Jung is a citizen of the State of California.

19.    Defendant Russell Nickel ("Nickel") served as the Company's CFO from October 2013 until he resigned in August 2019. He continued to serve as a Special Advisor to the Company through December 31, 2019. Upon information and belief, Nickel is a citizen of the State of Washington.

20.    Defendant Gino Dellomo ("Dellomo") has served on the Board since its formation in April 2017, and on the board of directors of FAH since October 2015. Dellomo has also served as a director at ACON Funko Investors L.L.C. ("ACON"), a private equity investment firm and a significant stockholder of Funko, since October 2006. Additionally, he serves as a member of the

Company's Nominating and Corporate Governance Committee.  For the fiscal year ended December 31, 2019, Dellomo received $123,525 in compensation from the Company.  This included $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.  During the Relevant Period, when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Dellomo made the following sale of company stock through his position at ACON:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

Upon information and belief, Dellomo is a citizen of Washington, D.C.

21.    Defendant Michael Lunsford ("Lunsford") has served as a Company director since October 2018.  He also serves as a member of the Company's Audit Committee.  According to the 2020 Proxy, as of April 3, 2020, defendant Lunsford beneficially owned 5,098 shares of the Company's Class A common stock, with an approximate implied value of $16,211 on that date.  For the fiscal year ended December 31, 2019, Lunsford received $123,525 in compensation from the Company.  This included $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.  Upon information and belief, Lunsford is a citizen of the State of California.

22.    Defendant Charles Denson ("Denson") has served as a Company director since April 2017.  Additionally, he has served as a director of FAH since June 2016.  Denson also serves as the Chair of Funko's Compensation Committee and as a member of its Audit Committee.  According to the 2020 Proxy, as of April 3, 2020, Denson was the beneficial owner of 159,517 shares of the Company's Class A common stock with an implied value of $507,264 on that date, as well as 16,058 shares of the Company's Class B common stock as of that date.  Denson received $138,525 in compensation from the Company during the fiscal year ended

December 31, 2019, which consisted of $65,000 in fees earned or paid in cash, $36,033 in option

awards, and $37,492 in restricted stock units.  Upon information and belief, Denson is a citizen

of the State of Oregon.

23.    Defendant Adam Kriger ("Kriger") has served as a Company director since April

2017.  Kriger has also served on the board of directors at FAH since June 2016 and has served as

an executive partner at ACON since August 2017.  Additionally, he serves as a member of the

Company's Nominating and Corporate Governance Committee.  For the fiscal year ended

December 31, 2019, Kriger received $123,525 in compensation from the Company.  This included

$50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock

units.  Upon information and belief, Kriger is a citizen of the State of California.  During the

Relevant Period, when the Company materially misstated information to the investing public to

keep the stock price inflated, and before the scheme was exposed, defendant Kriger made the

following sale of company stock through his position at ACON:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

Upon information and belief, Kriger is a citizen of the State of California.

24.    Defendant Ken Brotman ("Brotman") is the Chairman of the Board and has served

as a Company director since April 2017.  Brotman cofounded and serves as a managing partner

at ACON.  He has also served as a director of FAH since October 2015.  Additionally, he serves

as the Chair of the Nominating and Corporate Governance Committee and as a member of the

Compensation Committee.  For the fiscal year ended December 31, 2019, Brotman received

$163,525 in compensation from the Company.  This included $90,000 in fees earned or paid in

cash, $36,033 in option awards, and $37,492 in restricted stock units. During the Relevant Period,

when the Company materially misstated information to the investing public to keep the stock

price inflated, and before the scheme was exposed, defendant Brotman made the following sale of company stock through his position at ACON:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

Upon information and belief, Brotman is a citizen of the State of New York.

25.     Defendant Sarah Kirshbaum Levy ("Levy") has served as a Company director since September 2019.  For the fiscal year ended December 31, 2019, Levy received $78,737 in compensation from the Company.  This included $12,500 in fees earned or paid in cash, $36,043 in option awards, and $30,194 in restricted stock units.  Upon information and belief, Levy is a citizen of the State of New York.

26.     Defendant Diane Irvine ("Irvine") has served as a Company director since August 2017.  Additionally, she has served as a director of FAH since August 2017.  Irvine also serves as the chair of the Audit Committee and as a member of the Compensation Committee.  Irvine received $142,275 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $68,750 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.  Upon information and belief, Irvine is a citizen of the State of Washington.

27.     Defendants Mariotti, Fall Jung, Nickel, Dellomo, Lunsford, Denson, Kriger, Brotman, Levy, and Irvine are collectively referred to as the "Individual Defendants."

28.     Defendants Brotman, Irvine, Levy, Denson, Kriger, Mariotti, Dellomo, and Lunsford are collectively referred to as the "Director Defendants."

29.     Defendants Mariotti, Brotman, Dellomo, and Kriger are collectively referred to as the "Insider Selling Defendants."

30.     Defendants Irvine, Denson, and Lunsford are collectively referred to as the "Audit Committee Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the Company.  By virtue of such duties, the officers and directors of Funko were required to, among other things:

a.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

35.    Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     The Company has established a Code of Conduct (the "Code") that "applies to all

of our directors, officers and other employees."

37.     In the section titled, "Conflicts of Interest," the Code states:

Employees, officers and directors must act in the best interests of the Company.
You must refrain from engaging in any activity or having a personal interest that
presents a "conflict of interest" and should seek to avoid even the appearance of
a conflict of interest.  A conflict of interest occurs when your personal interest
interferes with the interests of the Company.  A conflict of interest can arise
whenever you, as an employee, officer or director, take action or have an interest
that prevents you from performing your Company duties and responsibilities
honestly, objectively and effectively.

38.     In the section on "Competition and Fair Dealing," the Code states:

All employees should endeavor to deal fairly with fellow employees and with
the Company's collaborators, licensors, customers, suppliers and competitors.
Employees should not take unfair advantage of anyone through manipulation,
concealment, abuse of privileged information, misrepresentation of material
facts or any other unfair-dealing practice.  Employees should maintain and
protect any intellectual property licensed from licensors with the same care as
they employ with regard to Company developed intellectual property.
Employees should also handle the nonpublic information of our collaborators,
licensors, suppliers and customers responsibly and in accordance with our
agreements with them, including information regarding their technology,
products and product pipelines.

39.     In the section titled, "Company Records," the Code states:

Accurate and reliable records are crucial to our business.  Our records are the
basis of our earnings statements, financial reports, regulatory submissions and
many other aspects of our business and guide our business decision-making and
strategic planning.  Company records include financial records, personnel
records, records relating to our technology, products and product development,
customer collaborations, manufacturing and regulatory submissions and all other
records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material
respects.  Each employee and director must follow any formal document
retention policy of the Company with respect to Company records within such
employee's or director's control.  Please contact your supervisor or the
Company's General Counsel to obtain a copy of any such policy or with any
questions concerning any such policy.

40.     In the section on the "Protection and Use of Company Assets," the Code states:

Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to monitor all electronic and telephonic communication. These communications may also be subject to disclosure to law enforcement or government officials.

41.     In the section titled, "Accuracy of Financial Reports and Other Public Communications," the Code states:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

42.     In the section titled, "Compliance with Laws and Regulations," the Code states:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

\*          \*          \*

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

\*          \*          \*

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market sensitive financial data. The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

43.    The Individual Defendants violated the Code by engaging in or permitting the

scheme to issue materially false and misleading statements to the investing public and to facilitate

and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty

and unjust enrichment. Furthermore, four of the Individual Defendants violated the Code by

engaging in insider trading. Also, in violation of the Code, the Individual Defendants failed to

maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

44.    In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

45.    Pursuant to the Charter:

> The purpose of the Audit Committee (the "Committee") is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.

> The Committee's responsibilities are limited to oversight.  The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements.  The Company's independent auditors are responsible for auditing and reviewing those financial statements.

*        *        *

**IV. Duties and Responsibilities**

<u>*Interaction with the Independent Auditor*</u>

1.    *Appointment and Oversight*.  The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee.  The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

2.    *Annual Report on Independence*.  The Committee must ensure that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, must actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence

of the independent auditor, and, if the Committee determines that further inquiry is advisable, must take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.  Annual Financial Statements and Annual Audit.

3.    *Audit Problems*.  The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4.    *Form 10-K Review*.  The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.    *Audit Committee Report*.  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6.    *Form 10-Q Review*.  The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7.    *Review of Earnings Releases*.   The Committee should discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8.    *Risk Assessment and Risk Management.*  The Committee must discuss the Company's policies with respect to risk assessment and risk management.

9.    *Review of Related Person Transactions*.  The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved or ratified by the Committee.

10.  *Review of Code of Ethics*.  The Committee must periodically consider and discuss with management and the independent auditor the Company's code of ethics and the procedures in place to enforce the code of ethics.  The Committee must also consider and discuss and, as appropriate, grant requested waivers from the code of ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

11.  *Hiring of Independent Auditor Employees*.  The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

12. *Complaint Procedures*.  The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

13. *Reports to the Board of Directors*.  The Committee must report regularly to the Board regarding the activities of the Committee.

46.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

47.     In addition, as executive officers and directors of a publicly-traded company whose Common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Funko to make false and misleading statements of material fact about the Company's financials and about Funko's maintenance of adequate internal controls.

48.     Each of the Individual Defendants further owed to Funko and its stockholders the duty of loyalty requiring that each favor Funko's interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and insider trading; (ii) conceal adverse information concerning the Company's operations, financial condition, and future business prospects; (iii) artificially inflate the Company's stock price; and (iv) enhance the Individual Defendants' Company positions and their profits and power stemming from such positions.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of Funko was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

52.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

53.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Funko and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

54.    Funko designs, sources, and markets a variety of pop culture consumer products. In connection with its product lines, the Company maintains licensing agreements with content providers such as Disney, Marvel, LucasFilm, Blizzard Entertainment, and Warner Brothers.

55.    The Company's most well-known brand is its Funko Pop! Line, which consists of thousands of unique, stylized vinyl figurines depicting people and characters from popular movies, books, TV shows, sports franchises, comics, anime and manga series, and video games.

56.    Throughout the Relevant Period, the Individual Defendants consistently touted the Company's sales and growth in SEC filings and press releases issued by the Company.  However, as the Company would later admit, Funko was actually facing lower than expected sales, and thus the Individual Defendants' claims regarding the Company's financial guidance and prospects were inaccurate and misleading.

57.     Additionally, in the Company's quarterly reports on Forms 10-Q filed with the SEC in August 2019 and October 2019, the Individual Defendants included generic warnings noting that *if* the Company were to misgauge demand for its products, the Company *could* accumulate excess inventory, which *could* have an adverse impact on the Company's financial prospects.   These statements, too, were inaccurate because such risks were not mere hypotheticals, but in fact had already materialized.

### THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS

58.     On August 8, 2019, the Company issued a press release announcing its financial results for the quarter ended June 30, 2019 (the "2Q19 Press Release").  The 2Q19 Press Release stated, in pertinent part:

Second Quarter 2019 Highlights

- Net sales increased 38% to $191.2 million
- Gross profit[] increased 35% to $71.2 million
- Gross margin[] decreased 90 basis points to 37.2%
- Income from operations increased 98% to $17.1 million
- Net income increased to $11.4 million from $0.3 million
- Earnings per diluted share increased to $0.16
- Adjusted Net Income[] was $12.9 million compared to $3.2 million in the second quarter of 2018, and Adjusted Earnings per Diluted Share[] was $0.25, compared to $0.06 in the second quarter of 2018
- Adjusted EBITDA[] increased 61% to $31.4 million

\*        \*        \*

The Company is raising its outlook for the full year 2019.  The Company now expects net sales to be in a range of $840 million to $850 million.  Adjusted EBITDA[] is expected to be in a range of $140 million to $145 million.  Adjusted Earnings per Diluted Share[] is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.  Adjusted EBITDA and Adjusted EPS are non-GAAP measures.  A table at the end of this release reconciles Funko's outlook for the full year 2019 Adjusted EBITDA and Adjusted Earnings per Diluted Share guidance to the most directly comparable

U.S. GAAP financial measures. Please refer to the "Non-GAAP Financial Measures" section of this press release.

59.    That same day, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2019 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by defendant Nickel and contained certifications pursuant to the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Mariotti and Nickel attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

60.    The 2Q19 10-Q reported the same financial results contained in the 2Q19 Press Release, and stated the following with respect to the Company's inventory levels:

*Our success depends, in part, on our ability to successfully manage our inventories.*

We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our

products that it carries, and reduce the shelf space allotted for our products.  If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.  If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

61.     On October 31, 2019, the Company issued a press release announcing its financial results for the quarter ended September 30, 2019 (the "3Q19 Press Release").  The 3Q19 Press Release stated, in pertinent part:

Third Quarter 2019 Highlights

- Net sales increased 26% to $223.3 million
- Gross profit[] increased 26% to $85.5 million
- Gross margin[] decreased 10 basis points to 38.3%
- Income from operations increased 36% to $22.6 million
- Net income increased to $15.5 million from $7.6 million
- Earnings per diluted share increased to $0.25
- Adjusted Net Income[] was $19.9 million compared to $13.6 million in the third quarter of 2018, and Adjusted Earnings per Diluted Share[] was $0.38, compared to $0.27 in the third quarter of 2018
- Adjusted EBITDA[] increased 20% to $40.6 million

\*        \*        \*

The Company is reiterating its outlook for the full year 2019.  The Company expects net sales to be in a range of $840 million to $850 million.  Adjusted EBITDA[] is expected to be in a range of $140 million to $145 million.  Adjusted Earnings per Diluted Share[] is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

Adjusted EBITDA and Adjusted EPS are non-GAAP measures.  A table at the end of this release reconciles Funko's outlook for the full year 2019 Adjusted EBITDA and Adjusted Earnings per Diluted Share guidance to the most directly comparable U.S.  GAAP financial measures.  Please refer to the "Non-GAAP Financial Measures" section of this press release.

62.     On that same day, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2019 with the SEC (the "3Q19 10-Q").  The 3Q19 10-Q was signed by defendant Fall Jung.

63.    The 3Q19 10-Q reported the same financial results contained in the 3Q19 Press Release, and again provided the risk factor related to Funko's inventory levels as stated in ¶ 60.

64.    The statements in ¶¶ 58-63 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, inter alia, that: (1) the Company was facing sales that were below expectations; (2) as a result, the Company would predictably incur millions of dollars in write-down to dispose of slow moving inventory; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

65.    On February 5, 2020, the Company issued a press release announcing preliminary fourth quarter 2019 financial results.  The press release revealed disappointing results across the board, including declining sales and slow-moving inventory.  The press release stated:

> Net sales are expected to be approximately $214 million, a decrease of 8% compared to $233 million in the fourth quarter of 2018.  Net sales were below expectations in mature markets, including the U.S., due to the challenging retail environment, which resulted in lower than expected purchases among Funko's top customers throughout the holiday season as well as softness in sales related to certain tentpole movie releases.  These factors more than offset strong growth both in Europe and the Loungefly brand during the quarter.

> For the fourth quarter of fiscal 2019, Funko estimates:

> - Net sales in the U.S.  will decrease approximately 9%, while net sales internationally will decrease approximately 8%, reflecting declines in mature international markets, including Australia and Canada, partially offset by continued double digit growth in Europe.
> - On a product category basis, net sales of figures will decrease approximately 10% and net sales of other products will decrease approximately 3% versus the year ago period, respectively.  Net sales of Loungefly items, included in other products, are expected to show continued double-digit growth in the fourth quarter offset by declines in other branded products.

22

- The Company will incur a one-time $16.8 million charge related to the write-down of inventory as a result of the Company's decision to dispose of slower moving inventory to increase operational capacity. This charge is incremental to normal course reserves and will have an unfavorable impact to gross profit[], gross margin[], net loss and net loss per diluted share in the fourth quarter.
- Gross profit[] will be in the range of $62.3 million to $62.8 million, while gross margin1 will be 29.2% to 29.4%. Gross margin excluding the one-time inventory write-down[] will be 37.0% to 37.3%.
- The Company will have a net loss in the range of $6.7 million to $6.0 million and net loss per diluted share of $0.12 to $0.11.
- Adjusted EBITDA[] will be in the range of $24.7 million to $25.7 million.
- Adjusted Net Income[] will be in the range of $8.1 million to $8.9 million and Adjusted Earnings per Diluted Share[] will be in the range of $0.16 to $0.18.

"While we are disappointed in our fourth quarter results, we are confident that our strong track record of innovation through new product categories and properties, as well as continued international expansion, will continue to propel the Company in 2020 and beyond. The underlying strength of our Pop! and Loungefly brands, combined with Funko's unique ability to leverage evergreen properties will enable the Company to achieve high-single-digit to low-double-digit sales growth in 2020," stated Brian Mariotti, Chief Executive Officer.

66.    The press release also indicated that the sales trends would not improve until the second half of 2020:

The Company expects its 2020 net sales growth rate to be in the high-single digits to low-double-digits. Additionally, the Company anticipates that top line trends will improve gradually throughout 2020 and will be largely weighted toward the second half of the year, with net sales in the first half expected to be down low-single-digits to flat compared to the first half of 2019. Funko plans to provide expanded guidance for 2020 in connection with the release of fourth quarter and full year 2019 financial results on March 5, 2020.

67.    On this news, the Company's stock price fell $6.20 per share, or 40%, to close at $9.29 per share on February 6, 2020, on unusually heavy trading volume.

68.    Then, on March 5, 2020, after the market closed, the Company issued a press release announcing its fourth quarter and full year 2019 financial results. Therein, the Company affirmed that net sales for fourth quarter had decreased 4% year-over-year to $213.6 million due

to, among other things, "softness at retail during the holiday season which led to a decrease in orders."

69.     On this news, the Company's stock price fell $0.32 per share, or over 4%, to close at $6.92 on March 6, 2020.

**THE DIRECTOR DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD**

70.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, certain of the Individual Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.

71.     The Director Defendants drafted, approved, reviewed, and/or signed the 2020 Proxy before it was filed with the SEC and disseminated to Funko's stockholders on April 15, 2020.  The Director Defendants negligently issued materially misleading statements in the 2020 Proxy.  These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

72.     The 2020 Proxy sought stockholder votes to, among others, elect defendants Brotman, Irvine, and Levy for a three-year term.

73.     In support of their bid to reelect defendants Brotman, Irvine, and Levy, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2020 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Funko faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2020 Proxy stated:

Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management policies and strategy, the most significant risks facing us, including cybersecurity, and oversees the implementation of risk mitigation strategies by management. Our Board of Directors is also apprised of particular risk management matters in connection with its general oversight role, including business continuity risks relating to the outbreak of the novel coronavirus, and approval of corporate matters and significant transactions. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

*      *      *

## CODE OF ETHICS

We have adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees. A copy of the code is available on our website at www.funko.com in the "Governance" section of the "Investor Relations" page. We expect that any amendments to the code, or any waivers of its requirements, that are required to be disclosed by SEC or Nasdaq rules will be disclosed on our website.

*      *      *

## AUDIT COMMITTEE

Our Audit Committee's responsibilities include, but are not limited to:

- appointing, compensating, retaining and overseeing our independent registered public accounting firm;

- discussing with our independent registered public accounting firm their independence from management;

- discussing with our independent registered public accounting firm any audit problems or difficulties and management's response;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing our policies on risk assessment and risk management;

- reviewing related person transactions; and

- establishing procedures for the confidential anonymous submission of complaints regarding questionable accounting, internal controls or auditing matters, and for the confidential anonymous submission of concerns regarding questionable accounting or auditing matters.

The Audit Committee charter is available on our website at www.funko.com. The members of the Audit Committee are Charles Denson, Diane Irvine and Michael Lunsford, with Ms. Irvine serving as Chair. Our Board has affirmatively determined that each of Mr. Denson, Ms. Irvine and Mr. Lunsford meets the definition of "independent director" for purposes of serving on an audit committee under Rule 10A-3 promulgated under the Exchange Act and the Nasdaq Rules, including those related to Audit Committee membership.

The members of our Audit Committee meet the requirements for financial literacy under the applicable Nasdaq Rules. In addition, our Board has determined that Ms. Irvine qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K, and under the similar Nasdaq Rules requirement that the Audit Committee have a financially sophisticated member.

The Audit Committee met ten times during the fiscal year ended December 31, 2019.

74.     The 2020 Proxy, thus, assured stockholders that both the Individual Defendants and the Board were involved with Funko's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Individual Defendants were failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in: (1) the Company facing sales that were below expectations; (2) as a result, the Company predictably incurred millions of dollars in write-downs to dispose of slow moving inventory; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

75.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to elect defendants Brotman, Irvine, and Levy.

**THE INSIDER SELLING DEFENDANTS SOLD SUBSTANTIAL SHARES OF FUNKO STOCK WHILE IN POSSESSION OF MATERIAL ADVERSE INFORMATION REGARDING THE COMPANY'S BUSINESS**

76.     During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of Funko common stock while in possession of material information that was adverse to Funko's business.

77.     While the price of Funko stock was artificially inflated and defendant Mariotti was in possession of material adverse nonpublic information, he sold 550,000 shares of personally held Funko stock at artificially inflated prices for proceeds of $13,385,000.

78.     While the price of Funko stock was artificially inflated and defendants Dellomo, Kriger, and Brotman were in possession of material adverse, nonpublic information, they sold 3,600,000 shares of Funko stock, held by ACON, at artificially inflated prices for proceeds of $91,512,000.

79.     In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

80.     As a result of the Individual Defendants' wrongful conduct, Funko disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Funko's credibility. Funko has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

81.     Furthermore, aside from tarnishing the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

82.    As a direct and proximate result of the Individual Defendants' actions as alleged herein, Funko's market capitalization has been substantially damaged, losing approximately $730 million in value as a result of the conduct described herein.  Specifically, Funko's share price increased to a high of $27.89 on the Individual Defendants' false and misleading statements in connection with the Company's second and third quarter 2019 results, only to fall to a share price of $6.92 on March 6, 2020, when the truth about Funko's business was finally revealed.

83.    Moreover, these actions have irreparably damaged Funko's corporate image and goodwill.  For at least the foreseeable future, Funko will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Funko's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.    Plaintiff incorporates the allegations herein by reference.

85.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

86.    Plaintiff is a stockholder of Funko, was a stockholder of Funko at the time of the wrongdoing alleged herein, and has been a stockholder of Funko continuously since that time.

87.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting Funko's rights.

88.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action and vigorously prosecute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

89.     At the time of the filing of this complaint, the Board consisted of the Director Defendants.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

90.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

91.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly or with reckless disregard reviewed, authorized, or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Funko.

92.     The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls over financial reporting were sufficiently robust and effective (or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties and have resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring

a suit on behalf of Funko to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

93.    Additionally, defendant Mariotti lacks independence for purposes of demand futility because his principal occupation is the CEO of Funko. Indeed, the 2020 Proxy admits that Mariotti is not independent. According to the 2020 Proxy, in 2019, Mariotti received total compensation of $4,025,457 and this amount is material to him. Further, Mariotti is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEMAND IS EXCUSED AS TO DEFENDANTS IRVINE, DENSON, AND LUNSFORD BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

94.    Defendants Irvine, Denson, and Lunsford were members of the Audit Committee at the time the Company lacked proper internal controls and the improper statements detailed herein were issued. Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and the integrity of the Company's financial statements and internal controls. Notably, in performing these duties, defendants Irvine, Denson, and Lunsford were required to discuss with management and the Company's independent auditor the annual financial statements. Defendants Irvine, Denson, and Lunsford were required to discuss with management and the Company's independent auditor all SEC filings before they were filed. Defendants Irvine, Denson, and Lunsford breached their fiduciary duties by allowing the Company to make the improper statements discussed above. Defendants Irvine, Denson, and Lunsford each face a

substantial likelihood of liability for their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

## DEMAND IS EXCUSED AS TO DEFENDANTS MARIOTTI, BROTMAN, DELLOMO, DENSON, KRIGER, AND IRVINE BECAUSE OF THEIR OVERLAPPING BUSINESS AFFILIATIONS

95.     Defendants Mariotti, Brotman, Dellomo, Denson, Kriger, and Irvine have extensive business relationships with each other, as they all also serve on the board of directors of FAH.  FAH is a holding company with no operating assets or operations that was formed on September 24, 2015, and was the predecessor to Funko.

96.     Additionally, defendants Brotman, Dellomo, and Kriger currently serve as high-ranking officers or directors of ACON, which controlled approximately 40.1% of total voting power over matters presented to Company stockholders for determination as of April 3, 2020, which includes the election of directors.  These conflicts of interest prevented these directors from conducting sufficient oversight over the Company's operations and internal controls and precluded them from calling into question the Individual Defendants' misconduct.

97.     For the foregoing reasons, demand as to defendants Mariotti, Brotman, Denson, Dellomo, Kriger, and Irvine is excused as being futile.

## DEMAND IS EXCUSED AS TO DEFENDANTS MARIOTTI, BROTMAN, DELLOMO, AND KRIGER BECAUSE OF THEIR IMPROPER INSIDER SELLING

98.     As described herein, four of the Director Defendants engaged in lucrative insider trading, in violation of federal law and the Company's Code.  Defendant Mariotti, as well as defendants Brotman, Dellomo, and Kriger, through their respective positions at ACON, netted total proceeds of over $104 million through insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements described herein.  Therefore, demand as to defendants Mariotti, Brotman, Dellomo, and Kriger is excused as being futile.

## COUNT I

### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
### (Against the Director Defendants)

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

101.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2020 Proxy.  In the 2020 Proxy, the Board solicited stockholder votes to reelect certain of the Individual Defendants to the Board.

102.    The 2020 Proxy, however, misrepresented and failed to disclose, among other things, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Funko misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect certain of the Individual Defendants to the Board.

103.    Plaintiff, on behalf of Funko, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2020 Proxy in connection with the improper reelection of certain of the Individual Defendants to the Board.

## COUNT II

### BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

104.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

105.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Funko's business and affairs.

106.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

107.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Funko.

108.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

109.    In addition, the Individual Defendants further breached their fiduciary duties owed to Funko by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact that failed to disclose: (1) Funko was facing sales that were below expectations; (2) as a result, the Company would predictably incur millions

of dollars in write-downs to dispose of slow moving inventory; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

110.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

111.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

112.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Funko has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

114.    Plaintiff on behalf of Funko has no adequate remedy at law.

## COUNT III

### UNJUST ENRICHMENT
### (Against Individual Defendants)

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Funko in the form of salaries, bonuses, and other forms of compensation.

117.    Plaintiff, as a stockholder and representative of Funko, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
### (Against the Insider Selling Defendants)

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    At the time defendants Mariotti, Brotman, Dellomo, and Kriger sold their Funko stock, they knew the material, nonpublic information described above, and sold Funko stock on the basis of such information.

120.    The information described above was proprietary, nonpublic information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which defendants Mariotti, Brotman, Dellomo, and Kriger misappropriated to their own benefit when they sold personal holdings in Funko stock. Defendants Mariotti, Brotman, Dellomo, and Kriger knew that this information was not intended

to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Funko stock.

121.    Defendants Mariotti, Brotman, Dellomo, and Kriger's sale of stock while in possession and control of this material adverse, nonpublic information was a breach of their fiduciary duties of loyalty and good faith.  They are therefore liable to Funko for insider trading.

122.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

123.    Plaintiff, on behalf of Funko, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Funko and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: July 31, 2020

Respectfully Submitted,

**DELEEUW LAW LLC**

*/s/  P.  Bradford deLeeuw*
P.  Bradford deLeeuw (#3569)
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
*Attorney for Plaintiff*

**OF COUNSEL**

**ROBBINS LLP**
Brian J. Robbins
Craig W. Smith
Eric M. Carrino
Emily R. Bishop
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990